## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| ANITA F. GOEBEL, | § | |
| **Plaintiff** | § | |
| | § | |
| v. | § | Civil Action No. 3:02-CV-2750-M |
| | § | |
| COMMISSIONER OF SOCIAL | § | |
| SECURITY, | § | |
| **Defendant.** | § | |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and an Order of the Court in implementation thereof, the subject cause has been referred to the undersigned United States Magistrate Judge for recommendation. Before the Court are Plaintiff's *Motion for Summary Judgment*, filed May 22, 2003, and Commissioner's *Cross-Motion for Summary Judgment*, filed June 18, 2003. Having reviewed the evidence of the parties in connection with the pleadings, the undersigned recommends that Plaintiff's *Motion for Summary Judgment* be **DENIED** and that Commissioner's *Cross-Motion for Summary Judgment* be **GRANTED**. Accordingly, the case should be **AFFIRMED**.

## I.   BACKGROUND[1]

### A.   *Procedural History*

Anita F. Goebel ("Plaintiff") seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying her claim for disability benefits under Title II of the Social Security Act. On March 6, 2000, Plaintiff filed an application for disability benefits. (Tr. at 80.) Plaintiff claimed she was disabled due to injuries sustained in an

---

[1] The following background facts come from the transcript of the administrative proceedings, which is designated as "Tr."

all-terrain vehicle accident, including damage to her left knee and left elbow, as well as fatigue and pain.  (Tr. at 29.)  Plaintiff's application was denied both initially and upon reconsideration.  (Tr. at 13.)  Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ").  *Id.*  A hearing, at which Plaintiff personally appeared and testified, was held on May 16, 2001.  *Id.*  On June 28, 2001, the ALJ issued her decision finding Plaintiff not disabled.  (Tr. at 15.)  The Appeals Council denied Plaintiff's request for review, concluding that the contentions raised in Plaintiff's request did not provide a basis for changing the ALJ's decision.  (Tr. at 4.)  Consequently, the ALJ's decision became the final decision of the Commissioner.  *Id.*  Plaintiff timely appealed the Commissioner's decision to the United States District Court pursuant to 42 U.S.C. § 405(g) on December 23, 2002.

**B.**    ***Factual History***

   1.    Plaintiff's Age, Education, and Work Experience

   Plaintiff was born on May 30, 1948.  (Tr. at 30.)  At the time of the hearing  before the ALJ, she was 52 years old.  *Id.*  Her formal education ended in tenth grade, and she subsequently obtained a GED.  (Tr. at 33.)  Plaintiff's past relevant work was as a wafer specialist processor for Texas Instruments.  (Tr. at 43.)  Plaintiff had not worked since the date of her accident, April 2, 1999.  (Tr. at 29.)

   2.    Plaintiff's Medical Evidence

   The medical evidence in the record begins with Plaintiff's admission to East Texas Medical Center following an all-terrain vehicle accident on April 2, 1999.  (Tr. at 170.)  In the admission history and physical, the admitting physician noted that Plaintiff's injuries included pubic diastasis, a complex distal comminuted fracture of the humerus, and an ischial pubic ramus fracture.  (Tr. at 172.)  John Camp, M.D., performed surgery on Plaintiff's left elbow to repair

2

the supracondylar humerus fracture on April 2, 1999.  (Tr. at 161.)  After the surgery, Dr. Camp

noted that the elbow was flexed, extended, and free of any entrapment.  (Tr. at 163.)  Plaintiff

also underwent an open reduction and internal fixation of her pubic diastasis on April 8, 1999.

(Tr. at 145.)  Dr. Camp discharged Plaintiff from East Texas Medical Center on April 19, 1999.

(Tr. at 144.)  He estimated that within two to three weeks Plaintiff would be able to begin

bearing weight and more aggressively mobilizing her elbow.  *Id.*

Upon release from East Texas Medical Center, Plaintiff was admitted to Baylor Medical

Center at Garland under the care of Rita Hamilton, D.O., for rehabilitation.  (Tr. at 243.)

Plaintiff was discharged from Baylor Medical Center at Garland on May 7, 1999.  (Tr. at 241.)

In the discharge summary, Dr. Hamilton recommended the use of a cane when walking, with

weightbearing as tolerated.  (Tr. at 242.)  Dr. Hamilton also ordered outpatient occupational

therapy.  *Id.*

Plaintiff visited Dr. Camp on May 13, 1999, to follow up on her left distal humerus

fracture and her pelvic pubic symphysis diastasis.  (Tr. at 258.)  Dr. Camp noted that Plaintiff's

elbow was able to achieve 95° to 100° of flexion, but that it was "fairly stiff" with extension,

getting to approximately 70° shy of full.  *Id.*  Plaintiff was walking with a cane and complained

of some discomfort in her left knee.  *Id.*  Examination revealed both knees as being

ligamentously stable.  *Id.*  Dr. Camp instructed Plaintiff to work aggressively on the left elbow,

digit, and hand range of motion.  *Id.*  He also informed her that she should bear her weight fully

on her legs without restriction.  *Id.*

Plaintiff began occupational therapy on May 17, 1999.  (Tr. at 213.)  In the initial therapy

assessment, the occupational therapist remarked that Plaintiff was able to grip four pounds with

the left hand and sixty-three pounds with the right hand.  *Id.*  She also noted that Plaintiff

complained of extreme pain with both passive and active movement of the left upper extremity. *Id.*

Plaintiff followed up with Dr. Hamilton on June 7, 1999, at which time Dr. Hamilton remarked that Plaintiff "[looked] great" and that her elbow revealed well-healed surgical scars. (Tr. at 223.)  Dr. Hamilton noted that Plaintiff had a decreased range of motion in both her left elbow and shoulder, as well as decreased flexion in her left-hand fingers and wrist.  *Id.*  Upon examination of the left lower extremity, Dr. Hamilton found slight swelling of the left ankle.  *Id.*

Plaintiff's occupational therapist commented on June 10, 1999, that Plaintiff was making slow but steady improvements in the use of her left arm.  (Tr. at 212.)  The therapist added that Plaintiff had achieved some of the goals of the occupational therapy sessions.  *Id.*

An x-ray of Plaintiff's left knee, taken June 11, 1999, revealed mild degenerative changes of the patellofemoral compartment with no fracture detected.  (Tr. at 226.)  An x-ray of Plaintiff's pelvis, also from June 11, showed a healing fracture of the right superior ischial ramus and junction of the inferior ischial pubic ramus.  (Tr. at 226-27.)

Plaintiff followed up with Dr. Camp on June 29, 1999, regarding her pelvic pubic symphysis diastasis and left elbow supracondylar fracture.  (Tr. at 257.)  The left elbow incision appeared well-healed, but Plaintiff was still complaining of stiffness in her elbow.  *Id.*  Plaintiff had 115° of flexion and was 80° shy of full extension.  *Id.*   Dr. Camp ordered continued aggressive mobilization of the elbow with dynamic splinting.  *Id.*  He also referred Plaintiff to Hugh Frederick, M.D., to determine whether Plaintiff would require a capsulectomy in order to regain mobility of the elbow.  *Id.*

 Plaintiff's physical therapist reported on July 1, 1999, that Plaintiff was responding well to therapy and had met the therapy goals of increasing strength and decreasing swelling and pain.

(Tr. at 203.)  The therapist requested that Plaintiff be discharged from physical therapy but continue occupational therapy.  *Id.*  On July 8, 1999, Plaintiff's occupational therapist noted that her major limiting factor was her left elbow, which was limited in both flexion and extension. (Tr. at 208.)  The therapist also commented that Plaintiff was slowly improving in her ability to use her left hand and that Plaintiff had met some, but not all, of the therapy goals.  *Id.*  Plaintiff was placed on "on hold" status with her occupational therapy on July 28, 1999.  (Tr. at 205.) Plaintiff's situation was reassessed on October 28, 1999, at which point she was discontinued from occupational therapy because Plaintiff's physician had not sent new orders to restart therapy.  *Id.*

On July 28, 1999, Plaintiff visited Dr. Frederick regarding stiffness in flexion and extension of her left elbow.  (Tr. at 280.)  Dr. Frederick found that Plaintiff had 106° flexion and was 65° short of full extension.  *Id.*  After examining Plaintiff and reading x-rays of her left arm, Dr. Frederick spoke with Plaintiff about the possibility of surgery on her elbow to increase her range of motion.  (Tr. at 281.)  Plaintiff returned to Dr. Frederick's office on August 3, 1999 after a CT scan of her left upper extremity.  (Tr. at 275.)  In the scan, the ulna and the radioulnar joint appeared well-aligned.  *Id.*  Dr. Frederick recommended posterior and anterior capsulectomies as a solution to Plaintiff's decreased range of motion in her left upper extremity. *Id.*

Dr. Frederick performed anterior and posterior capsulectomies, with selected hardware removal, of Plaintiff's left elbow at Mary Shiels Hospital on August 23, 1999.  (Tr. at 272.) During surgery, he put the elbow through a range of motion and found that the surgical procedure had improved Plaintiff's range of motion to a full 145° flexion and extension to 30°. *Id.*

On September 7, 1999, Plaintiff visited Dr. Frederick for a follow up appointment.  (Tr. at 272.)  Dr. Frederick found that Plaintiff's elbow was in good alignment, but her range of motion had returned to its preoperative status.  *Id.*  Dr. Frederick instructed Plaintiff to commence with the Joint Active Splinting Program to increase her range of motion.  *Id.*  Plaintiff was fitted with flexion, extension, and forearm rotation splints on September 21, 1999.  *Id.*  At an office visit on October 12, 1999, Dr. Frederick observed that Plaintiff had made significant improvement in the range of motion of her elbow.  (Tr. at 263.)  He instructed her to continue with joint active splinting of the elbow and to follow up in a month.  *Id.*  On November 9, 1999, Dr. Frederick noted continued improvement in Plaintiff's range of motion and directed her to continue with the splinting program.  *Id.*

An MRI of the left knee performed at Baylor Medical Center at Garland on December 20, 1999, revealed no tears in the meniscus, very small effusion, and "a suggestion of mild chondromalacia patellae."  (Tr. at 199.)  Otherwise, Plaintiff's knee appeared intact.  *Id.*

On January 3, 2000, Todd Johnson, M.D., reviewed the MRI of Plaintiff's left knee and found that there was edema and bone-on-bone crepitation in the joint with mild patellofemoral malalignment and patellofemoral degenerative joint disease.  (Tr. at 287.)  He suggested that Plaintiff get a Q brace and begin a physical therapy program for quad and hamstring stretching and strengthening.  *Id.*  He also mentioned that she could be a candidate for a lateral release and patellofemoral debridement.  *Id.*

Plaintiff followed up with Dr. Frederick on January 4, 2000.  (Tr. at 263.)  At this visit, Dr. Frederick noted no significant change in Plaintiff's range of motion.  *Id.*  Because Plaintiff complained of "popping" in her elbow, Dr. Frederick x-rayed the joint.  *Id.*  He found that the hardware used to align her elbow in the initial surgery remained in position and that the humerus

6

looked "solidly healed." *Id.* He ordered two additional months of aggressive splinting. *Id.* On January 28, 2000, Dr. Frederick provided Texas Instruments with information regarding the extent of Plaintiff's disability. (Tr. at 268.) He stated that the date she would be able to return to work was unknown at that time, but that he anticipated her return to work date to be in early March. *Id.*

On February 3, 2000, Plaintiff visited Dr. Johnson for a follow up appointment. (Tr. at 286.) She complained of "catching" and "popping" in her knees and stated that she experienced problems "with stairs and when she [would get] down on her knees." *Id.* She added, however, that she was doing much better overall and that she felt she could tolerate the difficulties. *Id.* Dr. Johnson asked her to contact him if she reached a point where she "[could not] live with it anymore," at which time he would explain her surgical options to her. *Id.* He explained that her knee was likely to have "flare ups" that would require anti-inflammatories and rest. *Id.*

At an office visit on March 7, 2000, Dr. Frederick noted that Plaintiff was using her arm "to do most normal things" and released her to "try to use her arm as best she can." (Tr. at 263.) He did not believe that she would be able to return to her previous employment, but he did release her to find "a permanent light duty job with no lifting over ten pounds." *Id.*

Plaintiff returned to Dr. Johnson's office on August 22, 2000. (Tr. at 310.) She complained of "popping, grinding, and pain" in her knee that worsened at night and when straightening her leg. *Id.* Upon examination, Dr. Johnson found that Plaintiff had patellofemoral malalignment and patellofemoral degenerative joint disease. *Id.* He recommended that Plaintiff take anti-inflammatories supplemented with Tylenol and that she recommence her remedial exercises. *Id.* Dr. Johnson also prescribed Vioxx and Darvocet. *Id.*

Plaintiff was referred to Dubose Murray, M.D., for a consultative exam on August 23, 2000.  (Tr. at 288.)  X-rays of Plaintiff's left knee revealed no evidence of a fracture, dislocation, or loose bodies.  (Tr. at 294.)  Dr. Murray concluded that Plaintiff's left knee was normal.  (Tr. at 289.)  X-rays of Plaintiff's left elbow showed a well-aligned, well-healed supracondylar fracture.  (Tr. at 293.)  X-rays of Plaintiff's pelvis revealed an old separation of the pubis with one centimeter of diastasis and hardware intact.  (Tr. at 292.)  Dr. Murray observed that Plaintiff did not require any assistive device for ambulation or standing.  (Tr. at 290.)  Regarding work-related activities, Dr. Murray concluded that "sitting is long, standing is long without assistive devices, walking is moderate to long without assistive devices, lifting is moderate, and [Plaintiff had] fine finger control."  *Id.*

On August 29, 2000, in a questionnaire addressing Plaintiff's upper extremity limitations, Dr. Frederick stated that the stiffness in Plaintiff's left elbow had not changed since November 1999.  (Tr. at 299.)  In a symptom questionnaire, also completed August 29, 2000, Dr. Frederick classified Plaintiff's pain as moderate, affecting but not precluding Plaintiff's ability to function.  (Tr. at 302.)  He further stated that her allegations of pain were consistent with objective medical findings.  *Id.*

Plaintiff followed up with Dr. Johnson on September 22, 2000.  (Tr. at 310.)  He noted that she had not improved since her last visit.  *Id.*  Again, he assessed her as having patellofemoral degenerative joint disease.  *Id.*  Dr. Johnson informed Plaintiff that her options were either to live with her knee as it was or to try arthroscopic debridement.  *Id.*  Plaintiff responded positively to the suggestion of surgery but wished to postpone it until a later date.  *Id.*  Dr. Johnson opted to continue Plaintiff on Vioxx and gave her some Vicodin and Ambien to help her sleep at night.  *Id.*

On May 8, 2001, Dr. Johnson completed questionnaires regarding Plaintiff's knee.  He stated that Plaintiff had persistent pain and stiffness in her left knee due to patellofemoral malalignment and patellofemoral degenerative joint disease.  (Tr. at 304.)  He checked "yes" in response to a question asking whether or not Plaintiff had a marked limitation in her ability to walk or stand.  (Tr. at 305.)  However, he elaborated beneath the question that "walking and standing [were] ok" but that "climbing, squatting, working on knees, and stairs" caused pain.  *Id.* Dr. Johnson further stated that Plaintiff would require one ten-minute rest period per hour were she to return to work activity.  (Tr. at 307.)  He classified Plaintiff's pain in her left knee as moderately severe, seriously affecting her ability to function.  (Tr. at 308.)

3.    <u>Hearing Testimony</u>

Plaintiff testified at the May 16, 2001, hearing before the ALJ.  (Tr. at 26.)  She was represented by counsel at the hearing.  *Id.*

Plaintiff testified that she was fifty-two years old at the time of the hearing.  (Tr. at 30.) She completed high school through the tenth grade and then obtained a GED.  (Tr. at 33.) Plaintiff's past work experience consisted of working "in wafer fab" for Texas Instruments.  (Tr. at 34.)  Plaintiff stated that prior to her accident, she had worked in her garden, ridden her bicycle, and walked "about two miles every other day."  (Tr. at 40.)  She testified that at the time of the hearing, she was able to do household chores, including making the bed, washing dishes, and mowing the lawn on occasion.  (Tr. at 39, 41.)  She was also able to do laundry, carrying one pile of clothing at a time instead of lifting a laundry basket.  (Tr. at 40.)

As to her physical condition, Plaintiff testified that she could not extend her left arm and that she experienced pain in her left knee "pretty much all the time."  (Tr. at 34.)  She also stated that her pelvic injury did not "let [her] legs work like they should."  (Tr. at 35.)  She estimated

that she could walk 50 yards, stand between 10 and 15 minutes, and sit between 15 and 20 minutes.  (Tr. at 35-36.)  She could not squat but could kneel, although with difficulty.  *Id.*  She stated that she could not grip objects well with her left hand and could lift approximately 6 pounds on a repetitive basis with her left arm.  (Tr. at 39.)  At the time of the hearing, she was not seeing a doctor and was not receiving any therapy.  (Tr. at 41.)  Plaintiff testified that she was taking Tylenol and Motrin for pain during the day, as well as a sleeping pill and another pain medication at night.  (Tr. at 37.)

A vocational expert ("VE") also testified at the hearing.  (Tr. at 27.)  The ALJ asked the VE to respond to a hypothetical question which assumed an individual of Plaintiff's age, education, and prior relevant work experience with a residual functional capacity ("RFC") to perform work with the following limitations:  occasionally lifting 20 pounds; frequently lifting 10 pounds; sitting, standing, and walking at least 6 hours out of an 8 hour day; and occasional use of the left upper extremity.  (Tr. at 43-44.)  The VE testified that, based on the limitations set forth in the hypothetical question, Plaintiff would be unable to return to her past relevant work due to the limited use of her left hand.  (Tr. at 44.)  Other work in the economy, which could accommodate limited use of the non-dominant hand, included quality control jobs and unskilled clerical occupations.  (Tr. at 45-46.)  Quality control jobs existed in the following numbers: 22,000 in Texas, and 230,000 nationwide.  (Tr. at 46.)  Unskilled clerical occupations, such as general office clerk or mail clerk, constituted 130,000 jobs in Texas and 1.3 million throughout the United States.  *Id.*

## C.    ALJ's Findings

The ALJ issued her decision denying Plaintiff's disability benefits on June 28, 2001.  (Tr. at 19.)  The ALJ found that Plaintiff had not engaged in substantial gainful activity since the

alleged onset of disability, April 2, 1999.  (Tr. at 18.)  In addition, the ALJ found that the

stiffness in Plaintiff's elbow was severe within the meaning of the Code of Federal Regulations,

Title 20, Section 404.1520(b) (2004); however, the ALJ found that Plaintiff's impairment did not

meet or equal a listed impairment as of the date of the decision.  (Tr. at 15.)  Because the

Plaintiff had no medically determinable impairment which could have caused the symptoms

alleged, the ALJ concluded that Plaintiff's testimony was not entirely credible.  (Tr. at 16.)

Furthermore, the ALJ opined that Plaintiff's activities and treatment of her injuries were

inconsistent with the degree of disability and pain that she claimed to suffer.[2]  *Id.*  The ALJ also

determined that Dr. Johnson's assessment of Plaintiff's rest requirement was not entitled to any

weight because the opinion was unsupported by the medical record and was inconsistent with

tests and examinations.  (Tr. at 15.)

The ALJ determined Plaintiff's RFC based on the following information:  the medical

evidence provided by Plaintiff's treating physicians, Drs. Frederick and Johnson; x-rays; and

Plaintiff's statement that she was experiencing pain.  (Tr. at 16.)  The ALJ found that Plaintiff

retained an RFC of light work "with occasional use of the left non-dominant upper extremity."

*Id.*  Based on the testimony of the VE, the ALJ found that Plaintiff was unable to return to her

past relevant work.  (Tr. at 17.)  However, the VE also testified that other work that Plaintiff

would be able to perform existed in significant numbers in the state and national economies.  *Id.*

Specifically, the VE stated that Plaintiff could work quality control jobs, such as belt inspection

and linen grading, and clerical work.  (Tr. at 18.)  As such, the ALJ found Plaintiff to be not

disabled within the meaning of the Social Security Act.  (Tr. at 18.)

---

[2] The ALJ stated that over the counter medication, the only pain medication Plaintiff was taking during the day, did not appear commensurate with the degree of pain Plaintiff purported to experience.  (Tr. at 16.)  The ALJ also remarked that Plaintiff was not, at the time of the hearing, seeing a doctor or a therapist.  *Id.*  The ALJ concluded that it would be reasonable to believe that a person suffering a serious problem would have been receiving continual medical treatment.  *Id.*

## II.   ANALYSIS

### A.   *Legal Standards*

1.   Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).  In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

2.   Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988).  The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1.      An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.      An individual who does not have a "severe impairment" will not be found to be disabled.

3.      An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.      If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.      If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the inquiry, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The inquiry terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.      *Issues for Review***

Plaintiff presents the following issues for review:

(1)     Substantial evidence does not support the ALJ's finding that Plaintiff is capable of a significant range of light work;

(2)     The ALJ failed to give proper weight to the opinion of Plaintiff's treating medical sources; and

(2.1)   The assessment of the consultative examiner lacks specificity and does not provide substantial evidence to discount the opinions of Plaintiff's treating physicians.[3]

## C.     Issue 1:  Determination of Plaintiff's Residual Functional Capacity

Plaintiff alleges that the ALJ's finding that Plaintiff can perform a significant range of light work is not supported by substantial evidence.  (Pl.'s Br. at 7.)  Plaintiff states that the record supports a conclusion that she has the RFC for only sedentary work.[4]  (Pl.'s Br. at 6.)

An individual's RFC is the most he or she can still do despite recognized limitations.  20 C.F.R. § 404.1545.  "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."  SSR 96-8p.[5] "The ALJ is responsible for assessing the medical evidence and determining the claimant's residual functional capacity."  *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985).  An ALJ may consider an individual to have no limitation or restriction with respect to a functional capacity when there is no allegation of a physical or mental limitation or restriction of a specific

---

[3] Plaintiff did not specifically list this issue in her brief.  However, Plaintiff argued this point in the analysis of the weight given to the opinions of treating physicians.  (Pl.'s Br. at 9.)  Therefore, the Court addresses the issue.

[4] Plaintiff also argues that application of the Medical-Vocational Guidelines, Rule 201.14, directs a finding of disabled.  (Pl.'s Br. at 7.)  To establish that work exists for a claimant, the ALJ relies on the Medical-Vocational Guidelines or the testimony of a VE in response to a hypothetical question.  *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).  The Fifth Circuit has held that the Commissioner may rely on the Guidelines to establish that work exists for a claimant *only* if the Guidelines' "evidentiary underpinnings" coincide exactly with the evidence in the record.  *Lawler v. Heckler*, 761 F.2d 195, 197 (5th Cir. 1985.)  Because the ALJ found Plaintiff could not perform the full range of light work, the ALJ did not rely on the Medical-Vocational Guidelines, but properly consulted a VE.

[5] Social Security Rulings are binding on the administration, and the agency must follow its own procedure, "even where the internal procedures are more rigorous than otherwise would be required."  *Hall v. Schweiker*, 660 F.2d 116, 119 (5t h Cir. Unit A Sept. 1981) (per curiam) (collecting cases).  "Should an agency in its proceedings violate its rules and prejudice result, the proceedings are tainted and any actions resulting from the proceeding cannot stand."  *Id.*

functional capacity, and no information in the case record that there is such a limitation or restriction.  SSR 96-8p.  An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources.  *Id.*

In assessing Plaintiff's ability to perform work-related activities, the ALJ found that Plaintiff retained the RFC of "light [work] with occasional use of the left non-dominant upper extremity."  (Tr. at 16.)  The ALJ determined, through a finding of light work with occasional use of the left arm, that Plaintiff was capable of the following work activities:  lifting no more than 20 pounds at a time, frequent lifting or carrying of 10 pounds, frequent standing or walking, and sitting with some pushing and pulling of arm or leg controls.  20 C.F.R. § 404.1567(b) (2004).  In forming her RFC determination, the ALJ considered both the medical evidence and Plaintiff's testimony.  (Tr. at 15-16.)

In particular, the ALJ considered the medical records from the date of Plaintiff's accident in April 1999 through March 2000, which showed continued improvement in Plaintiff's elbow and knee injuries.  (Tr. at 143-44, 241-42, 263, 287.)  X-rays taken in July 1999 showed a healed fracture of Plaintiff's humerus.  (Tr. at 281.)  On March 7, 2000, Dr. Frederick noted that Plaintiff was using her arm "to do most normal things," and he released her to return to a "light duty" job.  (Tr. at 263.)  In an August 2000 questionnaire, Dr. Frederick did note, however, that stiffness continued to pose a problem for Plaintiff.  (Tr. at 299.)  Dr. Johnson stated on February 3, 2000, that Plaintiff was "doing very well."  (Tr. at 286.)  He also noted that although Plaintiff continued to have catching, popping, and difficulty with stairs, she felt "like she [could] tolerate it."  *Id.*  At an office visit in August 2000, Plaintiff informed Dr. Johnson that she was having "more and more problems with her left knee."  (Tr. at 310.)  Dr. Johnson advised only that

Plaintiff take anti-inflammatories and Tylenol, as well as continue her knee exercises.  *Id.*  Upon noticing no improvement in September 2000, Dr. Johnson informed Plaintiff that she could continue to tolerate the problems with her knee or try arthroscopic debridement.  (Tr. at 310.)  Plaintiff opted not to have the surgery.  (Tr. at 36-37.)  In a questionnaire dated May 8, 2001, Dr. Johnson noted that Plaintiff could walk and stand without difficulty.  (Tr. at 305.)  However, he also stated that "climbing, squatting, working on knees and stairs" caused pain.  *Id.*

In addition, the ALJ took into consideration the results of the consultative exam performed by Dr. Murray in August 2000.  (Tr. at 15.)  At the exam, Dr. Murray both physically examined Plaintiff and took x-rays of her knee and elbow.  *Id.*  Regarding Plaintiff's elbow, Dr. Murray concluded that Plaintiff had a healed supracondylar fracture with a limited range of motion in flexion, extension, and rotation.  (Tr. at 290.)  He added that it was "not unusual" to have a loss in range of motion after a fracture of such severity.  *Id.*  Dr. Murray stated that physical examination and x-rays of Plaintiff's left knee appeared normal.  *Id.*

The ALJ also considered Plaintiff's testimony at the hearing that she could not lift more than 6 pounds with her left hand, that she suffered fatigue and pain when walking, and that she could only stand for 10 to 15 minutes and sit for 15 to 20 minutes.  (Tr. at 35-36, 39.)  However, as treatment for her pain, Plaintiff was taking Motrin and Tylenol during the day, and she was neither seeing a doctor nor receiving any kind of therapy at the time of the hearing.  (Tr. at 37, 41.)  The ALJ therefore found that Plaintiff's testimony regarding her physical ability was not entirely credible.  (Tr. at 16.)  Specifically, the ALJ stated that it would be reasonable to believe that a person suffering as Plaintiff claimed to be would be taking stronger medication for pain and would be receiving continual medical treatment.  *Id.*  Furthermore, the ALJ noted that Plaintiff's level of activity around her home was not indicative of a disabling condition:  "She

makes breakfast, sits on the porch, reads and listens to birds, works in the yard, plants seeds, occasionally mows the yard and sometimes hires it done, watches flowers grow, does laundry, dishes, makes beds." (Tr. at 16.) The ALJ acknowledged that Plaintiff may have had some pain and stiffness in her left arm, but the ALJ also noted that "this was taken into consideration when determining her residual functional capacity."[6] *Id.*

The record reflects that the ALJ took into consideration all evidence supported by the medical records before determining Plaintiff's RFC. (Tr. at 15-16.) Multiple x-rays and physical examinations, as well as Plaintiff's own testimony regarding her daily activities, contributed to the ALJ's determination of Plaintiff's RFC. Furthermore, while Plaintiff testified to her level of ability, she failed to point the court to any evidence in the record which indicates she is unable to perform a limited range of light work. Thus, the Court finds that substantial evidence supports the ALJ's finding that Plaintiff is capable of light work with occasional use of her left upper extremity.

**D.     Issue 2:  Proper Weight for the Opinion of a Treating Physician**

Plaintiff contends that the ALJ failed to give the proper weight to the opinions of her treating physicians. (Pl.'s Br. at 8.) Specifically, Plaintiff alleges that the ALJ improperly discounted the opinions and assessments of Dr. Frederick and Dr. Johnson. *Id.*

"A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with …other substantial evidence.'" *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995) (citing 20 C.F.R. § 404.1527(d)(2)). "Even though the opinion and diagnosis of a treating physician should be afforded considerable weight

---

[6] The ALJ considered Plaintiff's elbow stiffness and pain through the objective medical evidence offered by Dr. Frederick.

in determining disability, 'the ALJ has sole responsibility for determining a claimant's disability status.'" *Martinez*, 64 F.3d at 176 (quoting *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990)). "[T]he ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." *Martinez*, 64 F.3d at 176 (quoting *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987)). If good cause exists, an ALJ may give a treating physician's opinion little or no weight. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000). "Good cause may permit an ALJ to discount the weight of a treating physician relative to other experts where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Id.* at 456

The Fifth Circuit held in *Newton* that "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2)." *Id.* at 453. Thus, before deciding not to give any weight to a treating physician's opinion, an ALJ must consider: (1) the physician's length of treatment of the claimant; (2) the physician's frequency of examination; (3) the nature and extent of the treatment relationship; (4) the support of the physician's opinion afforded by the medical evidence of record; (5) the consistency of the opinion with the record as a whole; and (6) the specialization of the treating physician. *Id.* at 456 (citing 20 C.F.R. § 404.1527(d)(2)). However, the court expressly excluded from the scope of *Newton* those cases "where there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another" as well as cases in which "the ALJ weighs the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases

for a contrary opinion."  *Id.* at 458.   Thus, "*Newton* is limited to circumstances where the administrative law judge summarily rejects the opinions of a claimant's treating physician, based only on the testimony of a non-specialty medical expert who had not examined the claimant."

The ALJ expressly discounted only one medical opinion, Dr. Johnson's assessment of Plaintiff's rest requirement.  (Tr. at 15.)  Dr. Johnson stated that he believed Plaintiff would require a 10 minute rest period every hour.  (Tr. at 307.)  However, the ALJ noted that the rest assessment was "inconsistent with x-rays and examinations that [failed] to show any abnormality in the knee and only some stiffness in the elbow."  (Tr. at 15.)  Because Dr. Johnson's opinion was unsupported by objective medical tests, the ALJ concluded that it was not entitled to any weight.  *Id.*  The Court therefore finds that the ALJ properly addressed the weight to be given to Dr. Johnson's rest assessment.

The Plaintiff also alleges that the ALJ improperly failed to give controlling weight to Dr. Frederick's assessment of the maximum weight Plaintiff was capable of lifting.  (Pl.'s Br. at 8.) Specifically, Dr. Frederick limited Plaintiff to lifting no more than 10 pounds on March 7, 2000, as well as noting in a questionnaire completed August 29, 2000, that Plaintiff could comfortably lift only 2 pounds on an occasional basis with her left arm.  (Tr. at 263, 301.) The ALJ found that Plaintiff was capable of a significant range of light work.  (Tr. at 18.)   This RFC finding indicates that the ALJ found Plaintiff able to lift no more than 20 pounds at one time and up to 10 pounds on a regular basis.  20 C.F.R. § 404.1567(b).  Furthermore, the ALJ allowed for limited use of Plaintiff's left arm.  (Tr. at 16.)   Although this finding is not in absolute accordance with Dr. Frederick's assessment, the ALJ does significantly restrict Plaintiff's lifting and carrying, especially with the left upper extremity.  In addition, as mentioned above, the ALJ noted that x-rays and examinations showed "only some stiffness in the elbow."  (Tr. at 15.)  The

ALJ did not discount Dr. Frederick's opinion entirely, but determined the extent to which his opinion was credible, based on objective medical examination.  Thus, the Court finds that the ALJ acted within her discretion, properly assessing the credibility of Dr. Frederick's opinion and weighting the opinion based on its credibility.

The Plaintiff further contends that the ALJ should have acknowledged the May 2001 questionnaire in which Dr. Johnson affirmatively responded when asked whether Plaintiff had a "markedly limited ability to walk and/or stand."  (Pl.'s Br. at 8.)  However, Dr. Johnson elaborated, in the space below the question, that "walking and standing [were] ok." (Tr. at 305.) The ALJ addressed Dr. Johnson's elaboration to the question and did not rely on the "yes" response alone.  (Tr. at 15.)  Thus, Plaintiff's contention is inaccurate, and the Court finds that the ALJ did in fact give weight to the opinion of the treating physician.

The ALJ may assess the credibility of the medical opinions and weigh them accordingly. *Scott*, 770 F.2d 482.  As noted above, the ALJ determined the credibility of the treating physicians' opinions and then granted a corresponding weight.  For the foregoing reasons, the Court finds that there is substantial evidence to support the ALJ's weighing of the medical opinions.

E.      ***Issue 2.1:  Specificity of the Consultative Exam***

Plaintiff alleges that "the assessment of the consultative physical lacks specificity and does not provide substantial evidence to discount the opinions expressed by Dr. Frederick and Dr. Johnson."  (Pl.'s Br. at 9.)  However, the ALJ's decision did not depend solely on the consultative exam as evidence contradicting the treating physicians' credibility.  (Tr. at 15-16.) As noted above, the ALJ relied on the medical evidence provided by the treating physicians themselves, as well as their opinions to the extent that such opinions were consistent with

objective medical evidence.  (Tr. at 15.)  The ALJ also addressed the Plaintiff's testimony regarding her daily activities, her medications, and her medical treatment.  (Tr. at 16.)  The ALJ did discuss the consultative exam, focusing primarily on x-rays and the examiner's objective observations.[7]  Because the ALJ did not rely solely on the assessment of the consultative examiner, the Court finds that any lack of specificity in the consultative exam is immaterial to the issue of substantial evidence.

### III.    RECOMMENDATION

For the foregoing reasons, the Court **RECOMMENDS** that the final decision of the Commissioner be **AFFIRMED**.

**SO RECOMMENDED** on this 28th day of June, 2005.


**IRMA CARRILLO RAMIREZ**
**UNITED STATES MAGISTRATE JUDGE**

---

[7] The ALJ noted that upon examination, Dr. Murray found no instability, no atrophy, and no abnormalities in the left knee.  (Tr. at 15.)  X-rays showed a normal knee and a well-healed elbow fracture.  *Id.*